UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

KEVIN PHILLIP,

                          Plaintiff,

               -v-

DORA B. SCHRIRO, Commissioner of the
New York City Department of Corrections,
WARDEN CRIPPS and WARDEN RIVERA,
of AMKC, NYC Department of Corrections,

                       Defendants.

-------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/22/14

No. 12-cv-8349-RA

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Kevin Phillip brings this action against now former New York Department of Correction Commissioner Dora B. Schriro and "Warden Cripps" and "Warden Rivera" of the Anna M. Kross Center ("AMKC") on Rikers Island. Plaintiff, who was previously incarcerated at AMKC but has since been transferred to a state correctional facility, asserts claims under the First Amendment. He alleges that he was prevented from attending Friday Islamic prayer services, called Jumu'ah, while being held in punitive segregation at AMKC. On July 31, 2013, the Court granted the first motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and dismissed Plaintiff's Complaint without prejudice.[1] After Plaintiff filed an Amended Complaint, Defendants again moved to dismiss. For the reasons stated below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff alleges that he was sentenced to punitive segregation at AMKC on two different occasions and that he was denied the right to attend Jumu'ah services during these periods. For purposes of this motion, the Court accepts as true all facts alleged by Plaintiff. See Kassner v.

---

[1] The defendants named in the original complaint were the City of New York, Warden Cripps, and Warden Rivera. (See Dkt. 2, 7.)

2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).   The Court considers the allegations in the Amended Complaint, as well as documents attached to it or incorporated by reference, including the letters and grievance records submitted as exhibits by Plaintiff.   See Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662 (2d Cir. 1996).

*First Period of Punitive Segregation*

Plaintiff was first placed in a punitive segregation unit for thirty-six days on November 22, 2011.  (Am. Compl. ¶¶ 8, 12, 28.)  He asserts that he asked the housing unit officer on Friday November 26, 2011[2] and Friday December 2, 2011 if he could attend Jumu'ah services, but each time the officer told him that he was not allowed to attend while he was in punitive segregation. (Id. ¶ 13.)

Plaintiff submitted a grievance on December 3, 2011 and sent a letter to Commissioner Schriro on December 9, 2011.  (Id. ¶¶ 14, 18, Exs. A, C.)  Commissioner Schriro forwarded Plaintiff's letter "to the appropriate unit for investigation." (Id. ¶¶ 21-22, Ex. D.)  In response to his grievance, a grievance representative notified Plaintiff in writing on December 12, 2011 that "due to his BING Housing classification he is allowed to attend Jumu[']ah with general services." (Id. ¶ 15, Ex. B.)  According to Plaintiff, Warden Cripps and Warden Rivera "were contacted by [a grievance representative] concerning the alleged violation of Plaintiff's religious rights and stated a resolution to correct the violation." (Id. ¶ 16, Ex. B.)  They were also "informed of Plaintiff's allegation[]s of religious violations by [Commissioner Schriro]." (Id. ¶ 24.)  On December 22, 2011, "Inspector Johnson from the Commissioner's office" and a grievance representative visited Plaintiff and told him that "arrangements were being made for inmates to observe religious services in the segregation day-room." (Id. ¶ 23.)

---

[2] The Court notes that November 26, 2011 was a Saturday, not a Friday, as Plaintiff alleges.

According to Plaintiff, however, he continued to be denied the opportunity to attend Jumu'ah services throughout the rest of his term in punitive segregation. (Id. ¶¶ 17, 20, 25.) As a result, Plaintiff missed Jumu'ah services on the following dates: November 26, 2011, December 2, 2011, December 9, 2011, December 16, 2011, and December 23, 2011. (Id. ¶¶ 13, 17, 20, 25.) On December 23, 2011, Plaintiff sent a second letter to Commissioner Schriro and filed a second grievance. (Id. ¶¶ 26-27, Exs. E, F.) On January 25, 2012, Plaintiff filed a Notice of Claim with the Comptroller of the City of New York asserting a violation of his religious rights. (Id. ¶ 29, Ex. G.)[3]

*Second Period of Punitive Segregation*

Plaintiff was again placed in punitive segregation on or about April 2, 2012 for forty-five days. (Id. ¶¶ 30, 37.) He alleges that, on April 6th and 13th, he again asked the housing unit officer if he could attend Jumu'ah services and was again told he could not. (Id. ¶ 31.)

Plaintiff filed a third grievance on April 17, 2012 and sent a third letter to Commissioner Schriro on April 23, 2012. (Id. ¶¶ 32, 34, Exs. H, I.) An AMKC Captain and "Mr. Durisch from the NYC Dept. of Corrections" visited Plaintiff on May 4, 2012 to ask if he was still being denied the right to attend religious services. (Id. ¶ 36.) Plaintiff said that he was, and also told them about the denials of the previous November and December. (Id.)

During Plaintiff's second period in punitive segregation, he asserts that he was prevented from attending Jumu'ah services on five Fridays: April 6, 2012, April 13, 2012, April 20, 2012, April 27, 2012, and May 4, 2012. (Id. ¶¶ 31, 33, 35-36.)

On May 26, 2012, Plaintiff sent a third letter to Commissioner Schriro describing these events. (Id. ¶ 38, Ex. J.) In this letter, Plaintiff reviews all of the occasions on which he was allegedly denied the right to attend Jumu'ah services. (Id. Ex. J.) He also asserts that he is being

---

[3] Although the Amended Complaint alleges this date to be February 25, 2012 (Am. Compl. ¶ 29), Plaintiff's Exhibit G indicates that it was January 25, 2012.

harassed.  (Id. at 4.)  The letter claims that Plaintiff was "transferred [from] one punitive segregation unit to another . . . with only seven days left on [his] sentence" and that this was "obvious harassment."  (Id.)  It also asserts that Plaintiff was sentenced to punitive segregation for only forty days, but that he was kept in punitive segregation an additional five days as a "reprisal[] because of his complaints" about Jumu'ah services.  (Id. at 5.)

Plaintiff seeks punitive and compensatory damages and a "declaration that the acts and [omissions] described . . . violate his rights under the Constitution and laws of the United States."[4]  (Id. ¶¶ 42-44.)

## APPLICABLE LEGAL STANDARD

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint . . . . [and] draw all reasonable inferences in favor of the plaintiff."  Kassner, 496 F.3d at 237 (citation omitted).  "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*."  Thompson v. Carter, 284 F.3d 411, 416 (2d Cir. 2002) (quoting Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998)). The Court inquires whether the Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  A *pro se* complaint "must be construed liberally with special solicitude and interpreted to raise the strongest claims that it suggests.  Nonetheless, a *pro se* complaint must state a plausible claim for

---

[4]  The declaratory judgment claim is moot as to the Wardens, because Plaintiff is no longer incarcerated at AMKC, and so it must be dismissed for lack of subject matter jurisdiction.  See Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) (dismissing prisoner's declaratory judgment claim as to defendants employed by correctional facilities where he was no longer being held, but not as to the other defendants employed by the DOCCS); see also Coll. Standard Magazine v. Student Ass'n of the State Univ. of N.Y. at Albany, 610 F.3d 33, 35 (2d Cir. 2010) (the Court has an obligation to consider mootness *sua sponte*).

relief." Hogan v. Fischer, 738 F.3d 509, 515 (2d Cir. 2013) (internal quotation marks and citation omitted).

## DISCUSSION

**A.    Free Exercise Claim[5]**

Plaintiff alleges that Defendants violated his right to freely exercise his religion under the First Amendment by preventing him from attending Jumu'ah services while he was in punitive segregation. Defendants argue that "[P]laintiff has failed to allege any facts showing that he was unable to practice his religion in a meaningful way." (Defs.' Mem. of Law 13.) They also assert that his claim fails because he has not alleged "that attending Jumu'ah services is a sincerely held religious belief." (Id.)

"It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Holland v. Goord, No. 13-2694-PR, 2014 WL 3360615, at *4 (2d Cir. July 10, 2014) (internal quotation marks omitted). Because Plaintiff, however, has adequately alleged that Defendants imposed a substantial burden on his religious practice, the Court need not determine whether a less rigorous test should be applied. See, e.g., id. at *4 (declining to decide this question because the plaintiff had established a substantial burden); McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir. 2004) (same).

Demonstrating a substantial burden on one's sincerely held religious beliefs "is not a particularly onerous task." McEachin, 357 F.3d at 202. One aspect of the inquiry is whether

---

[5]  The Court also construes the Amended Complaint to be raising a First Amendment retaliation claim. In a letter addressed to the Commissioner, which is attached as Exhibit J to the Amended Complaint and thus incorporated therein, he alleges that he was kept in punitive segregation an additional four days and "transferred [from] one punitive segregation unit to another . . . with only seven days left on [his] sentence" in retaliation for his complaints about attending Jumu'ah services. (Am. Compl., Ex. J at 4-5.) Defendants have not moved to dismiss that claim, and so the Court does not discuss it herein.

Plaintiff's beliefs "are 'sincerely held' and in [his] 'own scheme of things, religious.'" Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (quoting Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002)).  Although Plaintiff does not explicitly allege that his religious believes are sincerely held, his allegations, reflecting his steadfast determination to attend the Jumu'ah services in observance of his "Islamic duties and practice," (Am. Compl. Ex. F), are more than sufficient "to establish that [his] claim is based upon a sincerely held religious belief," Meadows v. Lesh, No. 10 Civ. 00223 (JJM), 2010 WL 3730105, at *3 (W.D.N.Y. Sept. 17, 2010).

Plaintiff's assertion that he was denied the right to attend Jumu'ah services on ten occasions adequately alleges that his practice of Islam was substantially burdened.  Courts have held that similar allegations, if true, would establish a substantial burden under the Free Exercise Clause.  See, e.g., Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (reversing district court's grant of summary judgment for the defendants where Muslim prisoner in disciplinary keeplock was prevented from attending Jumu'ah services on three occasions and from celebrating Eid ul Adha); Young v. Coughlin, 866 F.2d 567, 568-69 (2d Cir. 1989) (same where prisoner had been prevented from attending religious services for approximately five months while he was in disciplinary confinement); Covington v. Mountries, No. 13 Civ. 343 (VEC), 2014 WL 2095159, at *4-5 (S.D.N.Y. May 20, 2014) (finding Muslim prisoner who claimed that he was prevented from attending Jumu'ah services twice had alleged a substantial burden).  Although Plaintiff does not explicitly allege that attending Jumu'ah services is "central" to his practice of Islam, Ford, 352 F.3d at 594-95, this assertion is readily inferable from the complaint and attached exhibits.  (See Am. Compl. Ex. F ("[I]nmate has not seen any concrete actions being taken to allow this inmate to observe his Islamic duties and practice."), Ex. I ("Islam is my religion and when I am in general population I regularly attend.").)  Indeed, the Supreme Court

has observed that Jumu'ah, in particular, "is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer." O'Lone v. Estate of Shabazz, 482 U.S. 342, 345 (1987).   Additionally, the Second Circuit has "long held that prisoners should be afforded every reasonable opportunity to attend religious services" and noted that it is "error to assume that prison officials [are] justified in limiting [an inmate's] free exercise rights simply because [he is] in disciplinary confinement." Young, 866 F.2d at 570. Accordingly, Plaintiff's allegations are sufficient to state a claim for a violation of the Free Exercise Clause.

**B.     Personal Involvement of Defendants**

Defendants also argue that the Amended Complaint must be dismissed because Plaintiff has failed to allege their personal involvement.    "A defendant's supervisory authority is insufficient in itself to demonstrate liability under § 1983." LaMagna v. Brown, 474 F. App'x 788, 789 (2d Cir. 2012).   Rather, the defendant must have been personally involved in the alleged violation. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).   Personal involvement can be established by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Id. The Court construes Plaintiff's complaint as implicating the second element of the Colon test since his allegation, broadly speaking, is that the Commissioner and Wardens knew that Plaintiff was continuously being denied his constitutional right yet failed to implement a change.

Defendants assert that Ashcroft v. Iqbal, 556 U.S. 662 (2009), invalidated the Colon

factors regarding supervisory liability and that "to adequately allege personal involvement, a plaintiff must demonstrate that the defendant, through his or her own conduct, violated the Constitution." (Defs.' Mem. of Law 7.)  Although the Second Circuit has explicitly declined to resolve this issue, see Hogan, 738 F. 3d at 519 n.3; Grullon v. City of New Haven, 720 F. 3d 133, 139 (2d Cir. 2013), numerous district courts have confronted the question, and the Court is persuaded by the majority view that Colon remains good law.  See Vazquez-Mentado v. Buitron, No. 12 Civ. 0797 (LEK) (ATB), 2014 WL 318329, at *2 (N.D.N.Y. Jan. 29, 2014) ("The majority of district courts . . . have held that, absent any contrary directive from the Second Circuit, all five Colon factors survive . . . .); see also, e.g., Zappulla v. Fischer, No. 11 Civ. 6733 (JMF), 2013 WL 1387033, at *9 (S.D.N.Y Apr. 5, 2013); Liner v. Fischer, No. 11 Civ. 6711 (PAC) (JLC), 2013 WL 3168660, at *7-8 (June 24, 2013).  But see Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009), aff'd, 387 F. App'x 55 (2d Cir. 2010).  While it is true that Iqbal reinforces the well-established rule in this Circuit that *respondeat superior* does not apply to § 1983 claims, see 556 U.S. at 676, "Colon's bases for liability are not founded on a theory of *respondeat superior*, but rather on a recognition that personal involvement of defendants in alleged constitutional deprivation can be shown by nonfeasance as well as misfeasance." Qasem v. Toro, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010) (internal quotation marks omitted).  Therefore, unless or until the Second Circuit or Supreme Court rule otherwise, this Court agrees with the courts that have held that the Colon factors "still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated." Id. at 152.

  *1. Allegations Against Warden Cripps and Warden Rivera in their Individual Capacities*

  Plaintiff has pled sufficient facts to plausibly allege the personal involvement of the

Wardens. He alleges that he was denied his constitutional right to attend religious services on ten different occasions and that the Wardens were contacted by a grievance representative concerning these violations. (Am. Compl. ¶ 16). Plaintiff also claims that the Wardens were informed of the violations by the Commissioner. (Id. ¶ 24).

These "allegations fall squarely within the second Colon category." Zappulla, 2013 WL 1387033, at *10. Under the second Colon factor, "if a plaintiff alleges that a constitutional violation is ongoing, and that a defendant, after being informed of a violation through a report or appeal, failed to remedy the wrong, the plaintiff's claim against the defendant should not [be] dismissed under Rule 12(b)(6)." Id. at *9; see also Wright v. Smith, 21 F. 3d 496, 497-98, 502 (2d Cir. 1994) (inmate alleged personal involvement of Attica superintendent where the inmate's habeas corpus petition had notified the superintendent of the alleged violation while it was still ongoing); Rahman v. Fisher, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("After the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation . . . . [unless] the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it."); Burton v. Lynch, 664 F. Supp. 2d 349, 361-62 (S.D.N.Y. 2009).

This is not a case where it is clear that the Wardens had no "genuine" or "realistic" opportunity to intervene in the alleged violations of Plaintiff's rights. See Sash v. United States, 674 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (granting defendants' motion for summary judgment based on the fact that they had no opportunity to intervene when the Plaintiff claimed he was beaten by an officer since the incident lasted less than thirty seconds). Accordingly, because there has been no "discovery in this case, this Court will not dismiss Plaintiff's claims . . . at this time. Discovery . . . will reveal whether the [Wardens] were in a position to remedy the alleged ongoing constitutional violation Plaintiff complains of." Braxton v. Nichols, No. 08 Civ. 08568

(PGG), 2010 WL 1010001, at *9 (S.D.N.Y. Mar. 18, 2010).

      2.     *Allegations Against Commissioner Schriro in her Individual Capacity*

      Plaintiff's allegations against Commissioner Schriro, by contrast, must be dismissed for lack of personal involvement. A supervisory official is not deemed to have been personally involved solely by virtue of having received a letter or complaint from a prisoner and having referred it to the appropriate department for investigation, which is what Plaintiff alleges here. (Am. Compl. ¶ 21, Exs. C, D.) See, e.g., Goris v. Breslin, 402 F. App'x 582, 584 (2d Cir. 2010) (affirming dismissal on summary judgment for lack of personal involvement where the deputy commissioner received letters from the plaintiff and forwarded them to others for investigation); Rush v. Fischer, 923 F. Supp. 2d 545, 552 (S.D.N.Y. 2013) ("[P]ersonal involvement has not been shown where a supervisor's only response to an inmate's complaint is to refer the complaint to the appropriate staff for investigation."); Mateo v. Fischer, 682 F. Supp. 2d 423, 431 (S.D.N.Y. 2010) (dismissing where the Commissioner received plaintiff's letters, forwarded them to subordinates and sent the plaintiff a response because these allegations "prove only the scantest awareness of [Plaintiff's] claims"). Courts have so held, because "commissioners and prison superintendents receive large numbers of letters from inmates, and they delegate subordinates to handle them. If courts found personal involvement every time a supervisor forwarded a complaint to a subordinate, the requirement would lose all meaning." Mateo, 682 F. Supp. 2d at 430 (citation and internal quotation marks omitted). For the same reason, Plaintiff's contention that the Wardens were informed of the alleged violation by Commissioner Schriro does not establish her personal involvement. (Am. Compl. ¶ 24.)

      Indeed, the letter attached to the Amended Complaint is signed by someone other than Commissioner Schriro, presumably someone working in the Office of the Commissioner. (Am. Compl. Ex. D.) This makes the connection between the alleged constitutional violation and

Commissioner Schriro even more attenuated. See Garvin v. Goord, 212 F. Supp. 2d 123, 126 (W.D.N.Y. 2002) (plaintiff failed to allege personal involvement where the Commissioner "never saw any of [Plaintiff's] letters," but rather "the letters addressed to and received by [the Commissioner's] office were reviewed by his staff and forwarded . . . for investigation and response"). Plaintiff's claim against Commissioner Schriro in her individual capacity is therefore dismissed.

## C.    Municipal Policy or Custom

Defendants also argue that Plaintiff "fails to allege the existence of a municipal policy or custom" under Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978). (Defs.' Mem. of Law 10-11.) Although Plaintiff did name the City in his original Complaint, for unknown reasons he did not name the City as a defendant in his Amended Complaint. In any event, Plaintiff seeks to name Defendants in their official capacities, and that is equivalent to bringing a claim against the City itself. See Jackler v. Byrne, 658 F.3d 225, 244 (2d Cir. 2011) ("[A] claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself."); Crown v. Wagenstein, No. 96 Civ. 3895 (MGC), 1998 WL 118169, at *1 (S.D.N.Y. Mar. 16, 1998) ("[P]ro se complaints, if possible, should be construed as asserting" claims against defendants in their official and individual capacities).

To make out a claim against a municipality, a plaintiff must plead: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)). "[A]n 'official policy' within the meaning of Monell can[ ] be inferred from informal acts or omissions of supervisory municipal officials." Turpin v. Mailet, 619 F.2d 196, 200 (2d Cir. 1980), cert. denied, 449 U.S. 1016 (1980). "Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct

and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007).

Plaintiff's assertion that he was denied the opportunity to attend Jumu'ah services on each of the ten Fridays that he spent in punitive segregation over a five-month period supports a conclusion that the denial was pursuant to a policy or custom. Compare Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 420, 439-40 (2d Cir. 2009) (evidence of "more than a dozen" incidents over fifteen months was adequate to survive summary judgment under Monell), with Jones v. Town of East Haven, 691 F.3d 72, 85 (2d Cir. 2012), cert. denied, 134 S. Ct. 125 (U.S. 2013) (allegation of two or three instances over a period of several years was insufficient), Tanzi v. Town of Marlborough, No. 13 Civ. 1113 (GTS) (RFT), 2014 WL 2815777, at *8 (N.D.N.Y. June 23, 2014) (allegation of "three separate instances over an unspecified period of time" was insufficient), and Chepilko v. City of New York, No. 06 Civ. 5491 (ARR) (LB), 2012 WL 398700, at *15 (E.D.N.Y. Feb. 6, 2012) (allegation of "[five] isolated instances over a two year period" was insufficient). The consistent, repeated nature of Plaintiff's complaints and the fact that eight of the denials occurred after Plaintiff's first grievance was allegedly resolved in his favor further bolster this conclusion.

In addition, the grievance resolution attached to the Amended Complaint indicates that the AMKC administration was aware of the issue and purportedly working to find a way for Plaintiff to attend religious services. It states:

> On 12/3/11 IGRP advised the grievant that due to his BING Housing classification he is allowed to attend Jumu[']ah with general services. AMKC Ima[m] and administration was contacted and advised IGRP staff that options are currently being explored to meet religious requirements. IGRP will monitor. The Grievant[]'s action requested is modified.

12

(Am. Compl. Ex. B.)  Plaintiff also alleges that he filed two additional grievances and submitted three letters to the Commissioner's office, and that, in response, he received two in-person visits from high-ranking AMKC and Department of Correction officials, who told him that arrangements were being made for him to attend Jumu'ah.  (Id. ¶¶ 23, 36.)  All told, Plaintiff alleges that at least nine employees had actual knowledge that he was being denied the right to attend Jumu'ah services, and that at least three of them reached out to contact him about it.  (Id. ¶¶ 16-17, 24 (Warden Cripps and Warden Rivera), ¶ 23 ("Inspector Johnson from the Commissioner's office"), ¶ 36 ("AMKC Captain Irwin" and "Mr. Durisch from the NYC Dept. of Corrections"), Ex. I ("Officer Bussin," "Captain Dawkins," and "Dept. Jamison"), Ex. J at 4 ("[Off]icer Kong").)  Nonetheless, he continued to be denied access to services.

Considering the liberal pleading standards applicable to a *pro se* complaint, Plaintiff has plausibly alleged that municipal officials were faced with a pattern of misconduct and did nothing, and thus "acquiesced in or tacitly authorized" a policy or custom of not allowing Plaintiff to attend Jumu'ah services while in punitive segregation.  See, e.g., Okin, 577 F.3d at 440 (deeming it significant that a sergeant and a captain were aware of the repeated complaints and concluding that more than twelve incidents "suggest[ed] a consistent pattern of failing to adequately respond to [the plaintiff's] complaints . . . ."); King v. Morris, No. 86 Civ. 2829 (CSH), 1989 WL 49380, at *4 (S.D.N.Y. May 3, 1989) (plaintiff established a policy or custom where he "complained on numerous occasions" about brutality in his housing unit and none of the captains or other officials did anything); Rudow v. City of New York, 642 F. Supp. 1456, 1468 (S.D.N.Y. 1986), aff'd, 822 F.2d 324 (2d Cir. 1987) (plaintiff who alleged that "the City Defendants were put on notice of [the wrongdoer's] conduct on numerous separate occasions, and took absolutely no steps to remedy this problem until public pressure came to bear" had alleged a municipal policy or custom).  Because Plaintiff has adequately alleged a Monell claim,

13

and because the Court construes him to have named Defendants in their official capacities, such claim shall proceed.

## D.     Exhaustion of Administrative Remedies

Lastly, Defendants argue that it is clear from the Amended Complaint that Plaintiff failed to exhaust the available administrative remedies. (Defs.' Mem. of Law 15.)  They assert that "Plaintiff's allegations demonstrate that, at most, he [submitted] three initial grievances, . . . then abandoned all further compliance with the [Inmate Grievance Resolution Program (IGRP)]" and therefore his complaint should be dismissed for failure to exhaust. (Id. at 18.)  This argument is unavailing.

The Prison Litigation Reform Act provides that no action may be brought by a prisoner under § 1983 "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Where failure to exhaust is not clear from the face of the complaint, courts are hesitant to grant a motion to dismiss on that basis.  See Pratt v. City of New York, 929 F. Supp. 2d 314, 318-19 (S.D.N.Y. 2013); Leak v. Schriro, No. 11 Civ. 8023 (PAE) (JCF), 2013 WL 1234945, at *3-4 (S.D.N.Y. Feb. 20, 2013).  Indeed, the Supreme Court has cautioned against requiring plaintiffs to plead exhaustion, holding that "[f]ailure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints."  Jones v. Bock, 549 U.S. 199, 202-03, 216 (2007).

Following Jones, courts in this district have concluded that "plaintiffs cannot be penalized for what they do not say in their pleadings about their efforts to exhaust," McNair v. Rivera, No. 12 Civ. 06212 (ALC) (SN), 2013 WL 4779033, at *5 (S.D.N.Y. Sep. 6, 2013), and that "[w]here a prisoner indicates that he has taken *some* steps toward exhaustion, district courts will not normally infer from his silence as to any remaining steps that he has not fully exhausted," Groenow v. Williams, No. 13 Civ. 3961 (PAC) (JLC), 2014 WL 941276, at *3

14

(S.D.N.Y. Mar. 11, 2014).  See also Randolph v. City of N.Y. Dep't of Correction, No. 05 Civ.

8820 (GEL) (MHD), 2007 WL 2660282, at *8 (S.D.N.Y. Sept. 7, 2007).  Here, nonexhaustion is

not clear from the face of the Amended Complaint.  Moreover, a grievance representative

appears to have resolved Plaintiff's first grievance in his favor, stating that Plaintiff could attend

Jumu'ah services and that the IGRP would "monitor."  (Am. Compl. Ex. B.)  As the Second

Circuit has explained, "it would be counterintuitive to require inmates who win during the

grievance process to appeal their victories."  Abney v. McGinnis, 380 F.3d 663, 669 (2d Cir.

2004) (citing Sulton v. Wright, 265 F. Supp. 2d 292, 298–99 (S.D.N.Y. 2003) ("If a prisoner had

to grieve non-compliance with favorable decisions under the PLRA, prison officials could keep

prisoners out of court indefinitely by saying 'yes' to their grievances and 'no' in practice.")).

Defendants also argue that Plaintiff "admits that he abandoned the grievance process

when he was released from the punitive segregation unit on December 28, 2011," (Defs.' Reply

4-5), relying on the statement in Plaintiff's Opposition that once he "was released from the

punitive segregation unit back into the general population where he was no longer affected by

the existing violation in the punitive segregation unit, . . . any further complaint could not cure

the violation already suffered by the plaintiff," (Pl.'s Opp'n 5).  Plaintiff's Opposition is too

ambiguous for the Court to conclude that he concedes nonexhaustion, especially in light of his

assertion that he "further appealed to the Dept. of Corrections -- the highest administrative

agency over-seeing the entire matter . . . ." and that "[i]n this respect, [he] has exhausted his

administrative remedies."  (Id. at 4-5.)

Finally, Plaintiff's "allegations do not rule out the possibility that an exception to the

exhaustion requirement may apply."  Groenow, 2014 WL 941276, at *5.  The Second Circuit has

held that the exhaustion requirement may be excused if (1) administrative remedies were not in

fact available to him, (2) the defendant or defendants inhibited his exhaustion, or (3) the Court

should consider any other "special circumstances" that might justify his failure to exhaust. See Hemphill v. New York, 380 F.3d 680, 685 (2d Cir. 2004).[6] For this reason as well, the Court will not dismiss based on nonexhaustion at this time.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted as to Plaintiff's claims against Commissioner Schriro in her individual capacity. The motion is denied, however, as to Plaintiff's Free Exercise claims against Warden Cripps and Warden Rivera in their official and individual capacities and against the Commissioner in her official capacity. Plaintiff's claims for declaratory relief are dismissed as moot as to the Wardens. The City shall notify the Court by September 5, 2014 if referral for a settlement conference with Magistrate Judge Netburn would be productive at this time. The Clerk of Court is respectfully directed to substitute the new Commissioner, Joseph Ponte, in his official capacity, for former Commissioner Schriro,[7] and to close the motion at docket number 36.

SO ORDERED.

Dated:     August 22, 2014
           New York, New York

                                        Ronnie Abrams
                                        United States District Judge

---

[6] "Although the Supreme Court held in Woodford v. Ngo, 548 U.S. 81, 90 (2006), that prisoners must exhaust administrative remedies by 'using all steps that the agency holds out, and doing so *properly*,' courts within this Circuit have concluded that at least some of the exceptions recognized in Hemphill survive Woodford." White v. Schriro, No. 11 Civ. 5285 (GBD) (MHD), 2012 WL 1414450, at *6 (S.D.N.Y. Mar. 7, 2012), report and recommendation adopted, No. 11 Civ. 5285 (GBD), 2012 WL 1450422 (S.D.N.Y. Apr. 23, 2012) (citing cases).

[7] Federal Rule of Civil Procedure 25(d) provides that "when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. . . . [t]he officer's successor is automatically substituted as a party."